Burrow argument not to exceed 15 minutes for the plaintiff. 15 minutes will be shared by the defendants. Mr. Carter for the appellants. May it please the court, I'm Kent Carter. This is Darryl Sammons, my co-counsel. There are issues of summary judgment and issues of Daubert involved here. This involves a riding lawnmower purchased January 28, 2010 at Lowe's, built by MTD on behalf of its subsidiary Troy Bilt. Used less than 10 times between January 28, 2010 and June 10, 2010. When Robert Burgett is mowing his lawn, moving uphill, it tips backwards and over to the right, ejecting him. And in spite of the operator's presence control switch, continues to run, turns downhill as gravity will cause things to do, runs over the outside of his right foot, which would be the foot on the side if you're facing forward still on the mower, cuts two toes on the outside of the right foot, runs on down the hill, is heard by his neighbor, Annabelle Runyon, who is testified to run another hour to an hour and a half in spite of the fact there's nobody on board, and later ran out of fuel up against an obstruction downhill. We're talking downhill. On the Daubert issue, we retained Jay Nogan, a mechanical engineer, graduate of the University of Delaware, approximately 30 years experience, a varied career. We've summarized most of it in our brief. He's been deposed, he's filed three reports, he's filed a CV, so I'm not going to beat that. He personally inspected the mower twice, visual examination both times, tested the continuity, which is how you check an electrical system for resistance and coverage, carrying, noted the connector types and the possibility of exposures, was aware of the extreme vibration a mower is subjected to and the fact that mowers are stored outside, as was this one, which exposes them to the elements. Was able to demonstrate experimentally similar failure twice, and MTD's expert is their in-house vice president of product development and safety, Daniel Martins, likewise an engineer, excuse me, likewise a mechanical engineer, a graduate of Cleveland State. He testifies several times a year for MTD across the country, but not just in lawn mower cases, not just in riding lawn mower cases, but in snow blowers and leaf blowers and mulchers and all kinds of things like that. Mr. Martins knew that the safety interlock system, that's what MTD calls the operator presence control, which you sit on and your weight depresses all the way to the engine where it grounds it out, but MTD knows and Mr. Martin knows that the safety interlock system can fail. Under deposition, he would not tell me why, how or under what circumstances. The defendants have argued to the trial court that Mr. Nogan is not a professional engineer and that means he's just not taken the exam, that he's not licensed in any particular state and that he only had two electrical engineering courses in his mechanical engineering degree work. But the same is true for Daniel Martins, the exact same thing. He's likewise not a professional engineer, he's likewise not licensed in any particular state and he likewise had the two courses that are required of mechanical engineers. Your Honor, we... My review is pretty deferential of the decision of a district court to exclude an expert. What makes the decision below reversible? Because essentially two things. One, Judge Thapar essentially required that we put forth an electrical engineer and the industry leader did not believe an electrical engineer was necessary to evaluate this system. Their vice president of product safety, Daniel Martins, is not an electrical engineer either. Two, in a sense, you find this in the language of the memorandum opinion and order. It's what makes me believe he has, Judge Thapar, has exceeded the gatekeeper function and has abused discretion. He says the product is complex. Your Honor, this product has essentially unchanged in 50 years. If we forget that the product is in fact a riding lawnmower, which is nothing more than a mower, if you lift the hood on a riding lawnmower, Your Honor, you'll find the same engine you found on your push mower that's in your backyard. It may be a little bigger because it's got to drag my weight around, but it's still the same thing. But if we accept the premise that the product is the safety interlock system, it dead ends at what is called a magneto-driven engine. And a magneto-driven engine is science that has not changed in almost 100 years. It's the very engine that was in the 1903 Model T Ford. It's not a car engine. It's not a motorcycle engine. It's not a snowmobile engine or a four-wheeler engine. It doesn't have an overlaid electrical system that you can just turn a key and turn it off. In fact, Daniel Martins told me or agreed with me that a magneto-driven engine such as you'll find in your lawnmower is a perpetual motion machine. If you continue to feed it, it will never stop running because it creates its own electrical charge by virtue of two magnets passing each other. So it's technology that is 50-some years old at least, I think 100 years old at least. And to require an electrical engineer to address that I think is excessive. As I said, the industry leader didn't believe an electrical engineer was necessary, although they argued that one ought to be. Your Honor, Judge Thapar said the electrical system is intricate. It's not. Mr. Martins and I, Mr. Nogan and the defendants walked through this electrical system. But more importantly is the next comment. The court itself would be unable to make heads or tails of a diagram of the electrical system without assistance. That's not the standard. I would tell the court that I can, but that's not the standard either. It does not require an electrical engineer. It requires a person that is able to aid the trier of fact, that would be the jury, in understanding how this thing worked. Jay Nogan in his very first report walked through every electrical aspect of this machine. That demonstrates a knowledge of how this thing works. A mechanical engineer such as Jay Nogan's or Daniel Martin's are well versed in how this thing would work. The case law is very clear that a lack of specialization or a lack of being an expert on that particular product is not required. So what I essentially find myself confronted with before just the par on this was being held to a standard that I can't make unless I get an engineer that MTV itself doesn't think that they need to evaluate this product. So in spite of the fact that we owe just the par deference in this regard, it's still got to follow what ought to be required under Dover in requiring an expert to be able to assist the trier of fact. And that is to have a general knowledge of the field. That's what the case law says. And he demonstrated that through three reports, his testimony, and the testing that was directed. And by the way, again, and I know just the par thinks it's unfair or inappropriate to compare these two, but it's not because Daniel Martin's was not an outside retained expert by MTD. He's their vice president of product safety and development. They obviously believe that a mechanical engineer is competent to fill that role. Every outdoor power equipment thing they make has got some form of electrical overlay of it, but they're all magneto driven. Let me ask you this. In terms of expert witness qualifications, was the district court correct in keeping out the expert not because an electrical engineer as such was needed, as long as you could find somebody who could assist the trier of fact as a result of education, training, experience, and all of that, but the proposed expert here could not or did not prior to the entry of summary judgment identify a design defect or a manufacturing defect with the product. Wouldn't that be a sufficient basis to exclude the expert? Because as I understand the theories raised by your proposed expert was not as to what alternative design there could have been was not raised until the filing of the reply brief on appeal. Is that correct? Your Honor, I can't honestly say if that's correct or not, but I can tell you this, that we are essentially pursuing the manufacturing defect. I don't read Judge Tappar's ruling as getting to any of that. I read his ruling as saying you need an electrical engineer. But if I address what you're asking me, at least as I understand what you're asking me, how well has Jay Nogan identified a manufacturing defect? He has identified that and their own operator's manual says that this safety interlock system can fail. It's on page five of the operator's manual. You get it when you buy this. But Mr. Martins won't tell me how or why. But if he's identified that it failed, then he's identified what failed. What you're actually asking me and what Judge Tappar got hung up on is we can't say why, with particularity, it failed this time. What he said was it most likely failed due to some type of interference in a connector. You've got to remember, we go back to the facts of this. This machine is outside all the time. It lives outside. It was bought in January and it lives outside all the time. So it's exposed to the elements. It's not sealed like your car is. The connectors on it are, just think of a plug that is sticking up your metal and you push a piece of plastic covered other metal over it. That's what a connector is on a mower. Let me ask you this. I don't want to sound as though I'm splitting hairs here. But your expert, if I were to ask you what was the fault with the lawnmower, you would say that was identified by your expert, you would say that the expert couldn't identify specifically the defect. Rather, the expert would say that he thought that the defect could have been thus and so. In other words, he would state what the possibilities might be, but he couldn't identify what the actual defect was within the specificity. And I'm not trying to put words in your mouth, so if I'm misstating it, I know you'll correct me. Is that what the situation was prior to the granting of summary judgment? Respectfully, Your Honor, I do disagree. I believe what Mr. Nogan said and I believe what the facts of this case demonstrate. There's a probability that there was a defect in the operator present control system, the safety interlock system that begins at the seat and ends at the engine. And that's demonstrated by the fact that it continued to run. And it's not supposed to continue to run. If you leave the seat of that mower, it's not supposed to continue to run. It ran. Under Perkins v. Trailco, we've demonstrated in Kentucky, in this diversity case, that by circumstantial evidence that a defect existed. You can't always, and the case law says this, you can't always identify the specific defect. We are not willing to bite on the defendant's worm on a hook here and tell you that we think it's this specific place on this specific point. We are telling you that, and we told you just the part, that the defect begins at the seat and ends at the engine and is demonstrated clearly by the fact that it continued to run. So you're saying that your expert was not required to specifically identify the exact defect as long as he would say that there was some defect. That should have been sufficient to make his testimony admissible? I would tell the court that under the product liability law, as it applies in Kentucky, that a defect is something that is unreasonable, that it doesn't operate as it's expected to operate, you've got to concede, everyone would have to concede, that if it ran after he left the seat, that it didn't operate as it was expected to run. The fact that it kept running after he was ejected or fell off the seat, that's, I mean, obviously that's evidence of something, but that doesn't really tell us what the defect was, does it? Sometimes, and there's case law that says this, Judge, sometimes you just can't know why something reacts wrong, but if it reacted wrong, if it did wrong, then that's a defect, and that's what I think we've proven, Your Honor, my time's up. So if you can identify or you think you know the source of the mechanical or electrical problem, you don't have to specifically describe precisely the nature of the problem under Kentucky law, is that what you're saying? Your Honor, actually what Mr. Nogan said was that along the path of this circuit, which begins here, goes up to the engine and comes back here, under the path of that circuit there are numerous places that this could have intermittently failed due to moisture, due to vibration, due to some type of foreign matter interfering. That's what he said. Under Kentucky law, if we can identify that something was defective, show how it was defective, we don't have to always be able to identify the specific reason it was defective. And in this instance, Judge, and this was noted by Malin v. MTD out of the 7th Circuit, we're missing certain inspection reports in this case from the basic model, through the line models, through the completion of this particular machine. So in a sense, because I can't get those documents, there are some things I may never be able to show. Okay, in terms of the argument you just made there as to what has to be shown for the expert's testimony to be admissible, what's your best Kentucky case that supports that argument? Your Honor, I would say my best Kentucky case on this case is Perkins v. Trelco, which says that when a newer product fails under expected conditions, a circumstantial case is made of manufacturing defect. That's the law in Kentucky. And if we're talking about circumstantial evidence, it may be used in product stability law, and failure of a relatively new product may provide circumstantial evidence of a manufacturing defect, Kentucky Farm Bureau v. Deere. That is the law in Kentucky, that this was a relatively new product. You know, it's less than six months off the floor. It cannot, we're talking a purchase in January, late January. The event happens June 10th. It could not have been used more than a handful of times. We're talking about an extreme jarring event because it rared up and landed back down. What it would do in response to that, you know, no one really is ever going to know. Yeah, I guess what we're struggling with is if we wanted to know from your expert what was the specific nature of the electrical defect or the design defect, he really couldn't tell us that, could he? He couldn't tell it under that answer, Judge, but the specific nature that he would tell you, the specific nature that he said, is that this was manufactured in such a way that the connectors, the seat, the pressure switch, the seat, the connectors, the electrical line that plugs into the ground at the engine, that all of those are susceptible to interference by vibration, which a mower does, by interference by being exposed to elements, which this one was, by interference by elements, which this one was. But if we asked him what was done wrong in the manufacturing process based on his examination of the product, that's what he couldn't tell us. Your Honor, I believe that throughout a rather lengthy four-and-a-half-hour deposition that what he said was that the connectors are subject to being better made. And in fact, on other models also equipped with the Kohler engine, they changed connectors for this very problem. It's not our model, but on another model, several models actually, they changed connectors for that very problem. You know, if you can pull the ground off of an engine and it continue to run, then you can't stop that engine from cutting you up. That's what I'm talking about. Okay. Thank you, and I've gone way over. I understand you reserved four minutes for rebuttal, is that right? I don't believe I need that now, Judge. Drop that down to about two or one. Okay. Good morning. May it please the Court? Good morning. My name is Christopher Holacek. I represent MTD Products, Inc. in Troyville. I'm going to take 12 minutes and reserve three minutes to my co-counsel, who is actually representing the co-defendant, Lowe's. All right. He's agreed with that division of time? He has, Your Honor. Judge Clay, to answer your question, the trial court struggled mightily with what is wrong with this mower. And the judge said the problem that the plaintiffs have is that they can't pierce the veil of pure speculation because they really don't have any idea. The trial court correctly entered summary judgment. Let's assume that that's the case. That's not why he got rid of this expert. His decision was not based on the elements or ultimately the expert opinion. His decision was that this expert's not qualified. That is correct. And I'm struggling with that. I think the case law is pretty clear that an expert's qualifications need only be minimal. There's proposed expert witness should not be required to satisfy an overly narrow test. Trial courts and then the federal rules advisory comments itself are just point blank. Daubert doesn't work a sea change over federal evidence law. The trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system. So help me understand why this man's years of experience, his degrees, the fact that he has the same engineering degree that your expert has, his work as an accident reconstructionist in a number of cases, whether or not he can carry the day when he gets there is a different question. Why can't he get there? Why can't he testify? I agree. This is quite unique when an expert seems to get knocked out based on qualifications. But he didn't even meet the minimum qualifications, Your Honor. What are the minimum qualifications? He kept pointing to some undefined electrical problem with the circuit of control. That's not a qualifications question. Get that. Get that. But it's an electrical engineering issue. He's not an electrical engineer. His last time he took an electrical engineering class was 40 years ago when he was in college. He's been reconstructing accidents involving lawnmowers, blowers. Why are those not electrical issues? His background did not involve reconstructing a circuit of an operator process control device. He's never designed a wire harness on a mower. That's where my problem is. You think in order to have an expert that could testify in a case about a machine, that expert has to have been involved in the design or working with that actual kind of machine. Or have the background, education, and experience. Take your pick from any of those, but have to have minimum qualifications to get into that area. This particular expert had no experience, rather than experience, regarding a wire harness on an outdoor power equipment that is connected to an operator process control. So if somebody has a case that involves an outdoor wire harness, they have to go find an outdoor wire harness expert. Or someone with at least minimum qualifications who can speak about how the harness would work connected to an engine and a piece of an operator process control device. Isn't that a sea change? Isn't your argument a sea change in evidence law when an expert is there merely to opine on matters that would assist a jury in understanding the facts? I don't believe it's a sea change, Your Honor, because I don't believe that... I believe this trial court judge analyzed it correctly that this expert would not be of assistance to the jury. And your mechanical engineer would? My mechanical engineer has spent 25 years designing outdoor power equipment, has tested and designed wire harnesses, operator process control devices, has testified in that area a number of times. Because he works in the industry. And has also provided expert testimony to the Outdoor Power Equipment Institute, the American National Standards Institute. He's been doing that for a living. That would differentiate him from Mr. Nogan. But they never challenged our expert. And maybe at the end of the day, this trial court judge would have gotten to the same result. But coming back to what the trial court judge did, he did exclude Mr. Nogan. But he also said, listen, their case fails for other reasons. They have a design defect claim. And under Kentucky law, you have to prove that the product is unreasonably dangerous. They have no evidence of a design defect. They point to an alternate design about a kill-to-ground system that approaches being unreasonably dangerous. But he didn't say it's unreasonably dangerous at all. And the other problem that they have concerns the fact that there's circumstantial evidence. There is no physical evidence of a flaw. The mower works fine today. It worked fine at the time of the inspection. It worked fine when it left the factory at MTD. There is circumstantial evidence that they're relying upon. And when you're relying upon circumstantial evidence, you have to exclude all other factors that could excuse the defendant from causing the accident. Your position would be you win even if that expert testimony fails? Absolutely. There is no evidence of a design flaw. And then if we even get down to that, that the design flaw, you need expert testimony to point to a design flaw. And, Your Honor, you asked, Judge Clay, you asked is there evidence that would satisfy Rule 56 as to a design flaw? And there is none. They did not point to an alternative design. And even if they did, the court correctly pointed out that when you're relying upon a generalized defect theory based on limited circumstantial evidence, you then have to exclude all other possibilities that could have caused the accident. And they have a competing claim against the retailer, Lowe's. They're saying that Lowe's did something at the time of the store that caused the failure, whatever failure that may be. And Kentucky law is clear. If you're relying upon the circumstantial evidence based on the generalized defect theory, you have to rule out all other potential causes of the accident. They couldn't do that. They never attempted to do that because counsel conceded at trial at the summary judgment stage that no one could ever distinguish between what did MTD do or what did Lowe's do. And because of that conflicting testimony and theories, they cannot prove causation, which is an essential element of the cause of action. Now, with regard to the exclusion of Mr. Nogin again, Mr. Nogin is not. He is not an electrical engineer. He has no background in electrical engineering with regard to the Outdoor Power Equipment Institute. He's never designed any type of outdoor power equipment. And the seat switch, the seat switch itself is a complex piece of equipment because the American National Standards Institute requires that when the operator gets out of the seat, the plunger then is activated in the seat switch. It then sends a signal to the engine. The engine then shuts off. It then activates a brake to the three blades that are spinning at 200 miles an hour. The blades then have to come to a complete stop within five seconds. This particular design, according to their expert, satisfies the applicable safety standards. And in Kentucky, there is a rebuttable presumption that when a product satisfies the applicable safety standards, the product is defect-free, both in manufacture and in design. Now, the generalized defect theory that they espouse is usually limited to when the product is destroyed. It blows up, there's a fire, it burns down, and it would be unfair to require the plaintiff to point to a specific defect. The trial court allowed them to use the generalized defect theory here. And even with that, even with that, they cannot point to a flaw in the operation of the mower. Now, with regard to the manufacturing defect, that's the other theory. The manufacturing defect is that there has to be evidence that the product was not built or constructed in accordance with the manufacturer's specifications. Again, in this case, they cannot point to one piece of the component part on this product that was not built in accordance to the specifications of the manufacturer. So can I interrupt and go back on this? On a generalized defect claim, do you acknowledge that the machine kept running and therefore there was something wrong with it? I can't concede that because, as the trial court pointed out, there could be other explanations for that. Well, that's where I was getting at. Do you acknowledge that the machine kept running? That's the only evidence we have, Your Honor, so I would acknowledge that. And that's a problem because nobody's sitting on it. So there's a problem here, right? That would be a problem if no one's sitting on it based on why, because the way the system's designed is that the engine can't continue to run if the parking brake is on. We would concede that. Based on the testimony, that's what they said happened. And their failure was not ruling out every other possibility for that event? Based on causation, that's correct, Your Honor. Because based on the generalized defect theory, what then they have to do is they point to and exclude any possible cause that would excuse the other defendant. And what possible cause did they not point to and exclude? Well, their claims are against Lowe's, the retailer, saying that Lowe's must have done something wrong at the point of sale when they changed the battery, when they twisted the seat, when they received it from the manufacturer. They may have upset some wire. So they have to prove that, you know, the retailer didn't mess with the machine to prevail on a generalized defect claim? They don't have to prove that, but they have to exclude that possibility. That sounds like the same thing. Well, they have to exclude that something other than what MTD may have done was the cause of the accident. How do you exclude that the retailer messed with it? Well, that's the problem with their case, according to the trial court judge. So you can't win on a generalized defect claim? Not when you have two competing alternative theories against two separate defendants, no. Even if they're alternative theories? Even if they're alternative theories, because all we get is possibilities. And under Kentucky law, we have to tilt the balance from possibility to probability. And they don't get there. And they never get there because they have an alternative theory against a co-defendant. Well, what do you make of this trend where district judges are declining to let experts opine and therefore finding that the plaintiff can't prove the case? This is a perfect example, isn't it? Based on the qualifications of the expert? Well, if the qualifications of the expert do not meet the minimum requirements to be assistance to the jury, that's exactly what Dauber calls for. Yeah, but, I mean, you're talking about the only person who can opine here has to be, you know, a very specialized expert, unlike yours. And, uh... So that's where we are in litigation these days. You've got to have a really, really, really, really specific expert, or we're going to throw him out and tell him he can't prove your case? That's not what the trial court judge said. You still have to have minimum requirements. And a gentleman who took his last electrical engineering class was 40 years ago, who's never had any experience in electrical engineering, can't come into court and say, well, I think it's possibly this, it could be that, it could be this. So now you have to have taken a course recently? Well, a course, or maybe, Your Honor, experience, or maybe working on a project, doing some research in that field. He falls short on every one  So at the end of the day, we have an expert who is not qualified to get into biomechanical engineering principles, is not qualified to get into electrical engineering principles. What's a biomechanical? It would be a mechanical engineer who has experience with medical information about how a particular accident may have affected the plant, how the plant was hurt. So it's specialized in the area of human physiology, biology, medical, combine that with mechanical engineering. So you need a doctor who's a mechanical engineer in order to testify to the fact that it hurt his foot because the mower ran over it. Absolutely, not a doctor, but someone who has... I'm struggling with that answer, Counselor, because if all we want to do is help the jury understand the facts, the reality, the practicality of this question, I'm struggling with understanding why an accident reconstructionist would not at least be able to speak to that issue. And then if you think that that explanation is no good, you take them apart on the stand because that's the nature of litigation. You attack them on the stand and you show that it's an unreasonable explanation. You put your guy on. He says, I've got something better. Isn't that invading the province of the jury to prevent that kind of testimony? No, if the jury then is going to have to speculate. And they're going to be speculating as to how the accident may have happened. That's the problem. And that's why we call district judges gatekeepers and recognize their discretion? Absolutely. I mean, this particular gentleman said his basis for mechanical engineering expertise was that he played high school basketball and sits in an office chair. That's it. That's it. And he admitted in his deposition he's not a biomechanical expert, he's not a human factors expert, he has no training in medicine, he has no idea how that particular injury was caused. Because the other thing that we have not pointed out, and I know I'm over time, is that the blade was bent sometime after he purchased the product. The blade is bent below the cutting deck. And how that happened, no one knows. But was the injury the result of the blade being bent? We don't know. So unless the court has any other questions, I know I'm beyond time. All right, we'll hear from your colleague. I thought he used up his time. Well, we'll give him his time. Three minutes. Please, the court. Mr. Carter, Mr. Sammons. My name's Tom Anderson. I'm here today on behalf of Lowe's Home Improvement, LLC, and Lowe's Home Centers, Inc., which are the entities that operate the Lowe's Home Center in Paintsville, Kentucky, the retailer that sold this machine. I've only asked for three minutes of time because there's two points that I want to emphasize to this court in its consideration of the ruling, number one being that, as the retailer, we are not the manufacturer of this machine. We are not the designer of the machine. Our role was to sell the machine to the plaintiff. There is more to it than that, which I'll explain in a minute, but we're not sued for strict liability. The retailer is sued in negligence, and that leads me to the second point being that there is an absolute absence of evidence in this record. Even if you consider the testimony of Jay Nogan and give it full credit, that the employees of the Lowe's store in Paintsville, Kentucky, did anything negligent which led to the failure of the safety interlock switch on this machine. He simply does not criticize the Lowe's folks at all. So Lowe's contends that Judge Tappar was right in dismissing on summary judgment the Lowe's defendant and that this court should affirm the summary judgment to that extent. As the retailer, there is some amount of contact that the Lowe's stores have with these machines. They are shipped to the store in crates. Each store has an assembler. In this case, we believe the man to be Billy Cantrell, who has testified that he's assembled hundreds of these machines. What they do is they take them out of the crate, and when they come, the steering wheel is not mounted to save space, and the seat is either folded forward, down into the footwell of the machine to save space, or the seat is not connected. It's turned around backwards again to save space. What the assembler does is puts the steering wheel on, tightens the nut, and I don't think anybody contends that has anything to do with this case. But in installing the seat, what he does is turns it the right way, places it in the proper position, and hooks the hinge pin in. Why Lowe's got suit in this case, and it's understandable, is that the OPC, the Operator Presence Control Switch, is located in the bottom of the seat. You've seen a tractor seat. There's a little slot in there that that switch fits in, and when the seat sits down and the operator sits in it, it depresses a plunger and engages the safety interlock. So Lowe's employees did have some contact with the machine in the vicinity of the OPC. The other thing that the Lowe's employees did is when this machine was sold in January, it wouldn't start. I guess it's understandable, since it had been sitting in the building since the summer, and they ended up replacing the battery. They did get the machine started through the use of starting fluid. Mr. Burgett loaded it on his trailer, took it home, and ultimately used it about six times without incident before the offending incident occurred. I'm out of time. Well, if you can make it short. All right, very shortly. Jay Nogan, in his testimony and the lay testimony, is completely devoid of anything that either putting that seat on that machine did to cause the safety interlock system to fail and also completely devoid of anything that the salesman that replaced the battery did to cause or contribute to the failure of the safety interlock system. In his deposition, and I've cited the quotation from his deposition, Jay Nogan testified that, well, perhaps putting a 15- or 20-pound battery down on a ground wire could have caused some strands to break or may have loosened an already loose connection that was a manufacturing defect. He goes further to say, though, however, I didn't find that when I inspected the machine, and I didn't see any evidence of that. So simply with respect to the Lowe's entities, there is no evidence whatsoever that they were negligent or that their conduct caused or contributed in any way to the failure of the system, if in fact the system failed. Thank you. Thank you. Any rebuttal? Real briefly, Your Honors. I made four points. I'll take the last one first. The semantics of Mr. Nogan's poor choice of trying to give a simplified example of why he could not understand how you could cut the outside two toes of your right foot when the blade is sitting in between your legs and to use the example he used of playing basketball and sitting at his desk was you can't turn your foot that way. It will not turn all the way in. Poor choice of words, poor choice of expression seized by a defense counsel because they did a good job with that. Mr. Counsel for MTD addressed the court about the Siegel issues, about since I can't exclude what Lowe's might have done, and that's why I briefly addressed when I was up here the first time the fact that Lowe's is supposed to keep a PDI sheet. Billy Cantrell told us they're supposed to keep a PDI sheet. They don't have the PDI sheet. They didn't give the PDI sheet. The PDI sheet shows what Mr. Anderson was describing to you, that we turned it around, we put it together, we fired it up, and she drove off. At that point in time, there would be no claim against Lowe's, but in the absence of that PDI sheet, as the court in the Seventh Circuit observed in Malem v. MTD, what is the plaintiff to do? Because I don't have anything that will exclude Lowe's, and yet they end up with an arm against me because of that. MTD's vice president is no more qualified than Jay Nogan. I know Judge Lepar doesn't want me comparing the experts, but I don't see anything that says I shouldn't be, and I think we have to here because he's the vice president of product and safety development. Contrary to what counsel's telling you, nobody at MTD has designed a mower because mowers haven't changed in 50 years. What they've done is increase engine size. They've changed the way you might break something. They've moved the gas tank here. They've put a different size wheel on something, but you don't reinvent the wheel. You may go from 14 inch to 16 inch to 18 inches with spinners, but you don't reinvent the wheel, and that's what the problem is with not allowing me to compare Jay Nogan to Daniel Martins. Lastly, Your Honors, and I believe that you hit on this, Judge, they can't give you the minimum of what would be a qualification, and Judge Lepar didn't give us the minimum of what would be a qualification. So we keep hearing about minimum, but we don't get an idea of what that minimum is. I believe that I'm well more than the minimum. I believe that Mr. Nogan is well more than the minimum. A varied life brings much more to the table than being spoon-fed by a single industry. Your entire career, the mantra of that industry. Thank you. Thank you very much, and the case is submitted. I think that completes the call. You may adjourn court.